**No. 24-2815**

# In the United States Court of Appeals for the Ninth Circuit

THE GEO GROUP, INC.,

*Plaintiff-Appellee,*

v.

JAY R. INSLEE, in his official capacity as Governor of the State of Washington & ROBERT W. FERGUSON, in his official capacity as Attorney General of the State of Washington,

*Defendants-Appellants.*

Appeal from the United States District Court for the Western District of Washington (Settle, J.) 3:23-cv-05626

## APPELLEE'S ANSWERING BRIEF

Scott Schipma
The GEO Group, Inc.
4955 Technology Way
Boca Raton, FL 33431
(561) 999-7615
scott.schipma@geogroup.com

Dominic E. Draye
Christopher M. O'Brien
GREENBERG TRAURIG, LLP
2101 L Street NW
Washington, DC 20037
(202) 331-3100
drayed@gtlaw.com

*Counsel for Appellees*

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee The GEO Group, Inc. submits this corporate disclosure and financial interest statement. GEO is a nongovernmental corporate party organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. GEO has no parent corporation. BlackRock Fund Advisors and Fidelity Management and Research (FMR), LLC, inclusive of their related entities, are corporations that each own 10 percent or more of GEO's stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................ii

TABLE OF AUTHORITIES ................................................. iii

ISSUE PRESENTED ........................................................... 1

INTRODUCTION ................................................................ 2

STATEMENT OF THE CASE ............................................... 5

    I.    Washington's Efforts to Ban Federal Immigration
        Detention. ................................................................ 5

    II.   U.S. Immigration and Customs Enforcement Detention
        Facilities. ................................................................ 7

    III.  Washington's Efforts to Regulate NWIPC. ........................ 10

    IV.  The State's Enforcement Efforts.................................... 12

    V.   The District Court's Rulings Below. ............................... 14

STANDARD OF REVIEW.................................................... 15

SUMMARY OF THE ARGUMENT ....................................... 16

ARGUMENT ...................................................................... 19

    I.    GEO's Suit for Injunctive Relief Is Ripe............................. 19

    II.   HB 1470 Violates Federal Supremacy Through the
        Intergovernmental Immunity Doctrine.............................. 25

        A.   HB 1470 Expressly Favors State Agencies and
           Contractors over Federal Contractors. ....................... 26

           1.  HB 1407 Targets Federal Contractors................... 26

           2.  HB 1470 Imposes More Burdensome
               Requirements than Those Applicable
               to State Facilities. .................................... 33

i

B.      HB 1470 Directly Regulates Federal Contractors.......45

III.     HB 1470 Is Preempted. .......................................................49

A.      HB 1470 Unconstitutionally Encroaches on the
Fields of Immigration Enforcement and
Detention of Foreign Citizens in the United
States..........................................................................50

B.      HB 1470 Is an Unconstitutional Obstacle to
Accomplishing Federal Objectives.............................58

IV.     The District Court Did Not Abuse Its Discretion in
Finding that the Remaining Factors Support a
Preliminary Injunction. .......................................................63

CONCLUSION .................................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967)................................................................. 19

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012).............................................. 65

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2013)............................... 15, 16, 63

*Am. Ins. Assn. v. Garamendi,*
  539 U.S. 396 (2003)....................................................... 61, 62

*Arizona v. United States,*
  567 U.S. 387 (2012)................................................... *passim*

*Ariz. Dream Act Coal. v. Brewer,*
  855 F.3d 957 (9th Cir. 2017)............................... 54, 55, 65

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018).............................................. 25

*Big Country Foods, Inc. v. Bd. of Ed. of Anchorage Sch. Dist.,*
  868 F.2d 1085 (9th Cir. 1989)......................................... 3, 4

*Boeing Co. v. Movassaghi,*
  768 F.3d 832 (9th Cir. 2014)................................... *passim*

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000).............................................................. 61

*D.A. v. United States,*
  663 F. Supp. 3d 715 (W.D. Tex. Mar. 23, 2023) ................... 9

*Dawson v. Steager,*
  586 U.S. 171 (2019)..................................................... 29, 30

*De Canas v. Bica,*
   424 U.S. 351 (1976) ................................................................ 50, 51

*Demore v. Kim,*
   538 U.S. 510 (2003) ...................................................................... 52

*Feldman v. Ariz. Sec'y of State's Office,*
   843 F.3d 366 (9th Cir. 2016) ........................................................ 37

*Fellner v. Tri-Union Seafoods, L.L.C.,*
   539 F.3d 237 (3d Cir. 2008) .......................................................... 54

*Flower World, Inc. v. Sacks,*
   43 F.4th 1224 (9th Cir. 2022) ...................................................... 20

*GEO Group, Inc. v. Inslee,*
   No. 21-cv-05313-BHS, 2023 WL 7919947 (W.D. Wash.
   Nov. 16, 2023) .............................................................................. 6

*GEO Group, Inc. v. Newsom,*
   50 F.4th 745 (9th Cir. 2022) (en banc) ................................. *passim*

*Gibbons v. Ogden,*
   22 U.S. 1 (1824) ........................................................................... 62

*Hillsborough Cnty. v. Automated Med. Laboratories, Inc.,*
   471 U.S. 707 (1985) ...................................................................... 54

*Hines v. Davidowitz,*
   312 U.S. 52 (1941) ................................................... 2, 56, 57, 58

*Hughes v. Talen Energy Mktg., LLC,*
   578 U.S. 150 (2016) .................................................................. 2, 3

*Int'l Franchise Ass'n v. Seattle,*
   803 F.3d 389 (9th Cir. 2015) ........................................................ 37

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018) ...................................................................... 7

*Jones v. Bernanke,*
   557 F.3d 670 (D.C. Cir. 2009) ..................................................... 46

iv

*Lyon v. U.S. Immigr. and Customs Enf't*,
    171 F. Supp. 3d 961 (N.D. Cal. 2016) ................................................... 9

*Maldonado v. Morales*,
    556 F.3d 1037 (9th Cir. 2009) ........................................................... 23

*Matthews v. Diaz*,
    426 U.S. 67 (1976) ............................................................................ 57

*McCreary Cnty. v. Am. Civil Liberties Union of Ky.*,
    545 U.S. 844 (2005) .......................................................................... 22

*Nelson v. NASA*,
    530 F.3d 865 (9th Cir. 2008) ............................................................ 64

*North Dakota v. United States*,
    495 U.S. 423 (1990) ............................................................. 17, 26, 44

*Pimentel-Estrada v. Barr*,
    458 F. Supp. 3d 1226 (W.D. Wash. Apr. 28, 2020) ........................ 9, 53

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................ 2, 50, 51

*Puente Arizona v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) ...................................................... 15, 49

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) ............................................................. 56, 57, 58

*Seattle Pac. Univ. v. Ferguson*,
    104 F.4th 50 (9th Cir. 2024) ............................................................. 24

*Thomas v. Anchorage Equal Rts. Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ...................................................... 20, 24

*Toll v. Moreno*,
    458 U.S. 1 (1982) .............................................................................. 50

*Union Pac. R.R. v. Mower*,
    219 F.3d 1069 (9th Cir. 2000) ........................................................... 46

*United States v. Arizona,*
  641 F.3d 339 (9th Cir. 2011)..............................................................64

*United States v. California,*
  921 F.3d 865 (9th Cir. 2019)........................................................8, 35

*United States v. California,*
  No. 2:18-cv-00490-JAM-KJN, 2018 WL 3350892 (E.D. Cal.
  May 4, 2018)......................................................................................32

*United States v. Hynes,*
  759 F. Supp. 1303 (N.D. Ill. Mar. 26, 1991) .....................................30

*United States v. New Mexico,*
  455 U.S. 720 (1982)...........................................................................32

*United States v. Nye Cnty., Nev.,*
  178 F.3d 1080 (9th Cir. 1999)......................................................29, 30

*United States v. Texas,*
  599 U.S. 670 (2021).............................................................................2

*United States v. Washington,*
  142 S. Ct. 1976 (2022)....................................................................26, 27

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013)............................................................64

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988)...........................................................................20

*Washington v. United States,*
  460 U.S. 536 (1983)......................................................................28, 31

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................... 15, 63, 64

*Yates v. United States,*
  574 U.S. 528 (2015)...........................................................................21

*Zadvydas v. Davis,*
  533 U.S. 678 (2001).............................................................................4

## Federal Statutes

4 U.S.C. § 111 ............................................................................... 29

6 U.S.C. § 112(b)(2) ................................................................ *passim*

6 U.S.C. § 205 ............................................................................... 60

6 U.S.C. § 205(a) & (b)................................................................ 43, 44

6 U.S.C. § 205(b)(5) ..................................................................... 53

8 U.S.C. § 1231(g) ......................................................................... 55

8 U.S.C. § 1231(g)(1)................................................................ *passim*

8 U.S.C. § 1231(g)(2).................................................... 8, 35, 52, 53, 54

18 U.S.C. § 4013 note "Contracts for Space or Facilities,"
    Pub. L. 106-553, §1(a)(2), 114 Stat. 2762, 2762A-69....... 7, 8, 47, 48 55

28 U.S.C. § 530C(a)(4) .............................................................. *passim*

28 U.S.C. §1292(a)(1).................................................................... 15

42 U.S.C. § 2121 ........................................................................... 47

## State Statutes

Cal. Penal Code § 9501.................................................................... 6

Wash. Rev. Code § 43.70.170 ....................................................... 44

Wash. Rev. Code § 51.32.187(1)(b)................................................ 27

Wash. Rev. Code § 70.395.010(7) ................................................... 7

Wash. Rev. Code § 70.395.020(5) ................................................. 22

Wash. Rev. Code § 70.395.030(1) ................................................... 5

Wash. Rev. Code § 70.395.030(3)(a)–(h) ........................................ 5

Wash. Rev. Code § 70.395.040(1)(e)............................................. 22

Wash. Rev. Code § 70.395.040(1)(g) ...................................................... 21

Wash. Rev. Code § 70.395.050(1)(a) ...................................................... 23

Wash. Rev. Code § 70.395.050(5) .......................................................... 23

Wash. Rev. Code § 70.395.070 ............................................... 11, 23, 24, 26

Wash. Rev. Code § 70.395.070(1) .......................................................... 21

Wash. Rev. Code § 70.395.070(1)(a) ...................................................... 60

Wash. Rev. Code § 70.395.070(4) ............................................................ 3

Wash. Rev. Code § 70.395.080 .............................................................. 11

Wash. Rev. Code § 70.395.100 .............................................................. 12

Wash. Rev. Code § 70.395.100(2) ...................................................... 36, 37

Wash. Rev. Code § 70.395.100(6) .......................................................... 37

Wash. Rev. Code § 71.12.455(7) ............................................................ 37

## Regulations

8 C.F.R. § 235.3(e) ........................................................... *passim*

48 C.F.R. § 1.601(a) ............................................................ 43, 44, 47

48 C.F.R. § 3017.204-90 ......................................................... 8, 43, 44

WAC 137-32-030 ................................................................... 40

WAC 137-36-030 ................................................................... 41

WAC 137-55-030(1) ................................................................ 38

WAC 246-322-120(4),(5) ........................................................... 40

WAC 246-322-230 .................................................................. 39

WAC 246-337-124 .................................................................. 39

## <u>Other Authorities</u>

Administration and Management. U.S. Immigration &
    Customs Enforcement, *Performance-Based National
    Detention Standards 2011* (rev. Dec. 2016), *available at*
    https://www.ice.gov/doclib/detention-standards/2011/
    pbnds2011r2016.pdf ........................................................................ 9, 10

*GEO Group Inc. v. Inslee*,
    No. 3:21-cv-05313-BHS ............................................................................. 5

H.R. Rep. No. 114-668 (2016) ................................................................... 10

*Multiple Agency Fiscal Note Summary*,
    https://fnspublic.ofm.wa.gov/FNSPublicSearch/
    GetPDF?packageID=68477 (last accessed Jul. 18, 2024) ........... 12, 29

U.S. CONST. art. I, § 8, cl. 10-13 ............................................................ 57

U.S. CONST. art. I, § 8, cl. 3-4 ............................................................... 57

U.S. CONST. art. I, § 8, cl. 4 ........................................................ 4, 16, 50

U.S. Immigration & Customs Enforcement, *Performance-
    Based National Detention Standards 2011* (rev. Dec.
    2016), *available at* https://www.ice.gov/doclib/detention-
    standards/2011/pbnds2011r2016.pdf ............................................... 54

Washington State Senate Human Services Committee
    hearing on 2SHB 1470 - Concerning private detention
    facilities (Mar. 13, 2023 10:30 a.m. at 16:20), *available at*
    https://tvw.org/video/senate-human-services-
    2023031331/?eventID=202 .................................................................. 28

Washington State Senate Human Services Committee
    hearing on 2SHB 1470: Concerning private detention
    facilities (Mar. 13, 2023 10:30 a.m. at 16:20), available at
    https://tvw.org/video/senate-human-services-
    2023031331/?eventID=2023031331 .................................................. 10

Washington State Senate Ways & Means Committee hearing
on 2SHB 1470 - Concerning private detention facilities
(Mar. 30, 2023 12:30 p.m. at 4:07:34), available at
https://tvw.org/video/senate-ways-means-
2023031607/?eventID=2023031607........................................ 11, 28, 29

## ISSUE PRESENTED

In response to this Court's decision in *GEO Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc), which held that States could not prevent the federal government from using private detention facilities, Washington State adopted a statute purporting to regulate federal immigration detention and the contractors that provide those services, including The GEO Group.  The provisions of that law, which GEO is allegedly already violating, differ from the federal government's regulations and would impose additional costs and burdens on federal detention operations in Washington State.  The district court enjoined the Washington law under the doctrine of Intergovernmental Immunity, which derives from the Supremacy Clause of the U.S. Constitution and prevents States from regulating the federal government and its agents, either directly or through unequal burdens.  The question presented is:

Did the district court abuse its discretion in concluding that GEO was entitled to a preliminary injunction against enforcement of a state law that would regulate federal immigration detention, impose an unequal burden on the federal government and its contractors providing federal immigration detention services relative to detention services

1

provided by the State or its agents, and encroach on the federal field of immigration detention?

## INTRODUCTION

Defendants disagree with federal immigration law. That is their right. And they are hardly the first state politicians to prefer different immigration policies than those adopted in Washington, D.C. *See, e.g., United States v. Texas*, 599 U.S. 670 (2021); *Arizona v. United States*, 567 U.S. 387 (2012); *Plyler v. Doe*, 457 U.S. 202 (1982); *Hines v. Davidowitz*, 312 U.S. 52 (1941). Nor, in all likelihood, will they be the last.

Thankfully, the Supremacy Clause prevents the confusion and paralysis of 50 States enforcing their own preferred approaches to immigration. It does so through two doctrines: intergovernmental immunity and preemption. The former prevents either the direct regulation of the federal government and its agents or the imposition of disparate burdens on them relative to the State and its agents. The latter precludes state laws that encroach on a field in which federal regulation is "so pervasive that Congress left no room for the States to supplement it," *Arizona*, 567 U.S. at 399 (quotation and modification omitted), or that "stand[] as an obstacle to the accomplishment and execution of the full

2

purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

The Washington law at issue in this appeal, HB 1470, offends each of these principles. That should come as no surprise because the Washington Legislature adopted it for the express purpose of circumventing this Court's *en banc* decision in *Newsom*. 1-ER-18. And the Legislature hit its mark. It created a discriminatory regulatory scheme that applies to exactly one facility in the State: the Northwest ICE Processing Center ("NWIPC"), a federal immigration center, where GEO provides secure residential support services in accordance with federal standards under a contract with U.S. Immigration and Customs Enforcement ("ICE"). On its face, HB 1470 exempts Washington state facilities from its burdensome regulations: "The state and its agencies are not liable for a violation of this chapter." Wash. Rev. Code § 70.395.070(4). The district court granted GEO's motion for preliminary injunction on this basis alone.

This Court can also affirm the order below because HB 1470 offends intergovernmental immunity through direct regulation and because it is preempted by the extensive body of federal law governing immigration

3

detention. *Big Country Foods, Inc. v. Bd. of Ed. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989). In fact, this Court has already addressed the direct regulation issue on facts remarkably similar to this case. *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014). And "Congress' power to detain aliens in connection with removal or exclusion, the Court has said, is part of the Legislature's considerable authority over immigration matters." *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J., concurring); *see generally* U.S. CONST. art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish a uniform Rule of Naturalization").

The Supremacy Clause is politically agnostic. It prevents States' efforts to tighten, enhance, or enforce federal immigration laws, and it likewise precludes the State of Washington's effort to impose what it considers to be more salubrious conditions on the federal government's facilities operating within the State's borders. The Constitution does not permit this patchwork approach to immigration detention. This Court should affirm the preliminary injunction.

## STATEMENT OF THE CASE

### I.    Washington's Efforts to Ban Federal Immigration Detention.

In 2021, politicians in the State of Washington attempted to ban immigration detention within the State's borders.  They did so through Engrossed House Bill ("HB") 1090, which provided that "no person, business, or state or local governmental entity shall operate a private detention facility within the state or utilize a contract with a private detention facility within the state." Wash. Rev. Code § 70.395.030(1).  There were exceptions to this prohibition, *see* Wash. Rev. Code § 70.395.030(3)(a)–(h), but none applied to immigration detention facilities like the federal NWIPC.

GEO, which provides residential care support services at the NWIPC pursuant to federal standards under a contract with ICE, sued in federal district court, asserting that HB 1090 violated the Supremacy Clause and Contract Clause of the United States Constitution.  *See GEO Group Inc. v. Inslee*, No. 3:21-cv-05313-BHS.  The parties agreed to stay that proceeding until after this Court resolved a case involving a similar California statute, *Geo Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc).

5

In *Newsom*, GEO and the United States sought to enjoin the enforcement of a statute, Assembly Bill (AB) 32, providing that "a person shall not operate a private detention facility within [California]." Cal. Penal Code § 9501. This Court found AB 32 unconstitutional as applied to privately-operated federal immigration detention facilities under two Supremacy Clause doctrines: "Whether analyzed under intergovernmental immunity or preemption, California cannot exert this level of control over the federal government's detention operations. AB 32 therefore violates the Supremacy Clause." *Newsom*, 50 F.4th at 751. After *Newsom*, Washington conceded that HB 1090 is unconstitutional as applied to GEO as the operator of the NWIPC. *See GEO Group, Inc. v. Inslee*, No. 21-cv-05313-BHS, 2023 WL 7919947 (W.D. Wash. Nov. 16, 2023).

Undeterred, on May 11, 2023, Governor Jay Inslee signed into law Second Substitute H.B. 1470, 68th Leg., Reg. Sess. (Wash. 2023) ("HB 1470"). The law's expressed intent is to "prohibit the use of private, for-profit prisons and detention facilities in the state" through burdensome requirements, unannounced inspections, and, most importantly, private rights of action and onerous civil penalties for any violation of the new

law. Wash. Rev. Code § 70.395.010(7). The law applies only to the NWIPC. As its authors recognized, HB 1470 is simply a backdoor allowing the State to accomplish what this Court struck down in *Newsom*.

## II. U.S. Immigration and Customs Enforcement Detention Facilities.

Congress has authorized or required the detention of aliens under several different statutes. *See, e.g., Jennings v. Rodriguez*, 583 U.S. 281, 285–89 (2018). To carry out these detention obligations, Congress has directed that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4); 18 U.S.C. § 4013 note "Contracts for Space or Facilities," Pub. L. 106–553, §1(a)(2), 114 Stat. 2762, 2762A-69.

Congress specifically granted the Secretary of Homeland Security broad authority "to make contracts . . . as may be necessary and proper to carry out the Secretary's responsibilities." 6 U.S.C. § 112(b)(2). Similarly, Congress granted authority to "carr[y] out," "in the Secretary's reasonable discretion," the activities of ICE "through any means, including . . . through contracts, grants, or cooperative agreements with

non-Federal parties," except to the extent that such agreements are otherwise precluded by federal law.  28 U.S.C. § 530C(a)(4).  Congress has also directed that "[t]he [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and in 2000, Congress enacted a statute stating: "Notwithstanding any other provision of law, . . . the [Secretary] hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."  18 U.S.C. § 4013, Pub. L. 106–553, §1(a)(2), 114 Stat. 2762, 2762A-69.

Through these statutes, Congress has authorized ICE to use contracted detention facilities and services.  *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).  Indeed, it has instructed ICE to use contract facilities before building any new federal facilities.  8 U.S.C. § 1231(g)(2).  As one option, ICE officials "may enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services."  48 C.F.R. § 3017.204-90; *Newsom*, 50 F.4th 751.

8

As part of the congressional mandate to identify "appropriate" facilities, 8 U.S.C. § 1231(g)(1), federal immigration regulations identify qualifying criteria for entities contracted to provide detention services. Chief among those is "compliance with the Standard Statement of Work for Contract Detention Facilities," which incorporates ICE's Performance Based National Detention Standards ("PBNDS"). 8 C.F.R. § 235.3(e); *see Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1235 (W.D. Wash. Apr. 28, 2020) ("GEO is required to maintain conditions at the NWIPC in accordance with the Performance-Based National Detention Standards 2011 ('PBNDS')"); *Lyon v. U.S. Immigr. and Customs Enf't*, 171 F. Supp. 3d 961, 990 (N.D. Cal. 2016) (noting mandatory application of PBNDS); *D.A. v. United States*, 663 F.Supp.3d 715, 740 (W.D. Tex. Mar. 23, 2023) (finding compliance with PBNDS is "non-discretionary duty").

The PBNDS governs the provision of federal contracted immigration detention services. It stretches to more than 450 pages and includes detailed standards and requirements governing: (1) Safety, (2) Security, (3) Order, (4) Care, health and welfare, (5) Activities, (6) Justice, and (7) Administration and Management. U.S. Immigration & Customs Enforcement, *Performance-Based National Detention*

9

*Standards 2011* (rev. Dec. 2016), *available at* https://www.ice.gov/ doclib/detention-standards/2011/pbnds2011r2016.pdf.

The current PBNDS were implemented at the direction of Congress: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS . . . including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance . . . The Committee expects ICE to refrain from entering into new contracts or IGSAs that do not require adherence to . . . 2011 PBNDS standards." H.R. Rep. No. 114-668, at 35 (2016). And, as noted, mandatory compliance is incorporated into every ICE detention contract, including the contract with GEO at issue in this case. *See, e.g.,* 4-ER-671, 4-ER-683–84.

### III.  Washington's Efforts to Regulate NWIPC.

Against this backdrop of federal regulation, the Washington Legislature adopted HB 1470 to apply to a ***single*** facility in the entire State: the NWIPC. During a legislative hearing, HB 1470's primary House sponsor explained that the law would apply only to the NWIPC. Washington State Senate Human Services Committee hearing on 2SHB 1470: Concerning private detention facilities (Mar. 13, 2023 10:30 a.m. at

10

16:20), available at https://tvw.org/video/senate-human-services-2023031331/?eventID=2023031331. A week later, a representative of the Senate Committee on Human Services confirmed that "only one facility would be covered" by HB 1470, namely the NWIPC. Washington State Senate Ways & Means Committee hearing on 2SHB 1470: Concerning private detention facilities (Mar. 30, 2023 12:30 p.m. at 4:07:34), available at https://tvw.org/video/senate-ways-means-2023031607/?eventID=2023031607.

This targeted application was not accidental. Three sections of HB 1470 explicitly exempt state facilities that might otherwise face unlimited liability from private lawsuits. First, HB 1470 Section 5 creates a right of action for detained persons and specifies available monetary damages, injunctive relief, and the recovery of attorneys' fees and costs, but "[t]he state and its agencies are not liable for a violation of this chapter." Wash. Rev Code. § 70.395.070. Second, HB 1470 Section 6 creates an additional regime of civil penalties applicable to the NWIPC and enforceable by the attorney general, but again "[t]he state and its agencies are not liable for a violation of this chapter." Wash. Rev. Code § 70.395.080. Third, to avoid any state contractors slipping through the

11

cracks, HB 1470 Section 10 exempts a list of "private detention facilities." Wash. Rev. Code § 70.395.100. Defendant Attorney General Ferguson explained the reason for this list: "[w]hile prior versions of the bill could have impacted private detention facilities that DSHS might wish to contract with in the future, the new language in Section 10 of this bill exempts those types of facilities from the new requirements." *Multiple Agency Fiscal Note Summary*, https://fnspublic.ofm.wa.gov/FNSPublic Search/GetPDF?packageID=68477 at 15 (last accessed Jul. 18, 2024). By adding the exemptions in Section 10, the Washington Legislature assured that HB 1470 would apply only to the federal NWIPC.

## IV.   The State's Enforcement Efforts.

GEO's contract with ICE includes requirements that give ICE control over access to secure portions of the NWIPC. 4-ER-671. All requests for access to the secure portions of the NWIPC must obtain pre-clearance approvals from ICE, including all requests for access by federal and state employees, as well as GEO employees. GEO is without authority to provide access to the secure portions of the NWIPC absent ICE clearance and approval. *Id.*

On December 27, 2023, Washington Department of Labor & Industries ("L&I") Inspectors arrived at the NWIPC and demanded access pursuant to HB 1470 to conduct a comprehensive workplace inspection. ICE explicitly directed GEO to deny access to the facility. *See* 1-ER-63 (citing the State's complaint and accompanying declarations in No. 3:24-cv-05095). Two days later, L&I inspectors returned to the NWIPC and produced an *ex parte* warrant signed by a Pierce County Superior Court Judge ordering that L&I be allowed unfettered access to the NWIPC. The ICE Supervisory Detention and Deportation Officer ("SDDO") at NWIPC reviewed the warrant and directly advised the L&I inspectors that ICE denied entry into the facility. *Id.* (citing the State's complaint and accompanying declarations, which state "Ryan Jennings, ICE Supervisory Detention and Deportation Officer, refused us entry"). Nevertheless, on January 30, 2024, L&I filed a complaint in state court against GEO (not ICE), asking the court to hold GEO in contempt because it has allegedly "ignored [the] Court's warrant." *Id.*

Similarly, in late November of 2023, representatives of the Washington Department of Health ("DOH") twice arrived at the NWIPC unannounced and demanded unlimited access to the facility under the

13

authority of HB 1470 to investigate complaints about alleged violations of HB 1470. On December 18, 2023, DOH filed a Complaint against GEO in state court seeking an injunction compelling ICE to permit DOH to enter the NWIPC to conduct inspections and investigations pursuant to HB 1470.

## V.    The District Court's Rulings Below.

On July 13, 2023, GEO filed a complaint in the United States District Court for the Western District of Washington seeking declaratory and injunctive relief against the enforcement of HB 1470. Four days later, GEO filed its Motion for Preliminary Injunction, arguing that HB 1470 violated the Supremacy Clause and Contract Clause of the United States Constitution. Defendants responded with a motion to dismiss, arguing that the controversy was not yet ripe and that GEO had not stated a claim for relief.

On March 8, 2024, the district court entered an order: (1) dismissing as unripe GEO's challenge to Section 4 of HB 1470, which the court construed not to apply to GEO's current contract; (2) dismissing GEO's claims that Section 2 of HB 1470 violates the Contract Clause, is preempted, and violates intergovernmental immunity by directly

14

regulating federal activities; (3) denying Defendants' motion to dismiss GEO's claims that Sections 2, 3, 5, and 6 of HB 1470 discriminate against GEO in violation of the intergovernmental immunity doctrine; and (4) enjoining the enforcement of Sections 2, 3, 5, and 6 of HB 1470 against GEO as the operator of the NWIPC because these sections discriminate against GEO in violation of the intergovernmental immunity doctrine. Defendants filed the current interlocutory appeal of the preliminary injunction order pursuant to 28 U.S.C. §1292(a)(1). The district court's order on Defendants' motion to dismiss is not yet final.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"Preliminary injunctive relief is subject to 'limited review' on appeal." *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016) (quoting *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 993–94 (9th Cir. 2011)). This Court reviews a preliminary injunction for

15

abuse of discretion. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2013). "An abuse of discretion will be found if the district court based its decision on an erroneous legal standard or clearly erroneous finding of fact." *Id.* (quotation omitted).

## SUMMARY OF THE ARGUMENT

For a century, state politicians have been unable to resist the siren song of regulating immigration. But the Constitution entrusts the work of creating a "uniform" system of immigration to the federal government. U.S. Const. art. I, § 8, cl. 4. Congress has done so through a host of statutes, many of which assign specific tasks to various federal agencies. Those agencies, in turn, have developed applicable federal regulations, including rules for contracting with private businesses to provide immigration detention services and facilities.

The Supremacy Clause immunizes these federal activities from state regulation. It does so through the doctrines of intergovernmental immunity and preemption, each of which has subparts to address and defeat the different ways in which States attempt to override the federal government.

16

**Intergovernmental Immunity.**  First, the intergovernmental immunity doctrine prevents States from discriminating against the federal government and its contractors by burdening them with regulations that are not "imposed equally on other similarly situated constituents of the State." *North Dakota v. United States*, 495 U.S. 423, 438 (1990).  HB 1470's express exemptions for state agencies and their contractors creates exactly this type of forbidden discrimination against the federal government and its contractor, GEO, by singling out the NWIPC as the only facility in the State of Washington to which HB 1470 applies.

Second, the intergovernmental immunity doctrine prevents States from directly regulating the federal government or its contractors. *Boeing*, 768 F.3d at 839.  The voluminous requirements of HB 1470 do precisely that, mandating the way in which GEO, on behalf of the federal government, detains individuals awaiting deportation or determination of whether they will be deported.

**Preemption.**  The doctrine of field preemption excludes state regulations in an area where "the framework of regulation" is so "pervasive" as to demonstrate an intent to occupy the field.  *Arizona*, 567

17

U.S. at 399. As with numerous other aspects of immigration, the federal government has occupied the field of immigration enforcement and detention. It has done so with numerous statutes and implementing regulations, which preclude States from regulating on the same topic. Also, the field of immigration enforcement implicates "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.*

In addition, HB 1470 presents an obstacle to the scheme Congress has put in place. It replaces the regulations in the PBNDS with a different set of standards, created by and peculiar to the State of Washington. It also supplants the process for grievances that Congress created with private rights of action and state-imposed civil penalties. Each of these requirements departs from the "careful balance struck by Congress." *Id.* at 406. The obstacles that HB 1470 presents are just beginning to appear with the State's attempts to enter the NWIPC pursuant to HB 1470 and the resulting litigation in the district court. If all 50 States were to adopt similar legislation, the results for federal immigration enforcement would be crippling—and, as Defendants hope, prohibitively expensive for the federal government, leading to different

18

policy choices more consistent with their own views. But in our constitutional system, that policy debate must occur in daylight and within the federal system. Defendants' approach is an offense to the Supremacy Clause.

## ARGUMENT

### I. GEO's Suit for Injunctive Relief Is Ripe.

As a preliminary matter, Defendants attempt to avoid adjudication on a mistaken theory of ripeness. Opening Br. ("OB") 16–18. Not only is GEO currently alleged to be violating the terms of the new law, but the State has attempted to enforce the law on four occasions, including obtaining an *ex parte* warrant in an attempt to enforce HB 1470. GEO easily satisfies the requirements for Article III standing.

The "basic rationale" for the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). That rule does not, however, preclude pre-enforcement challenges to unconstitutional statutes. "Where a plaintiff brings a pre-enforcement challenge, the ripeness inquiry turns on 'whether the plaintiffs face a realistic danger of sustaining a direct injury

as a result of the statute's operation or enforcement, or whether the alleged injury is too imaginary or speculative to support jurisdiction.'" *Flower World, Inc. v. Sacks*, 43 F.4th 1224, 1229 (9th Cir. 2022) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)). Moreover, plaintiffs have "an actual and well-founded fear that the law will be enforced against them" when "the law is aimed directly at plaintiffs." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988).

GEO is not only currently alleged to be in violation of HB 1470, but the State has ***already*** attempted to enforce the statute, including using it as a basis to obtain a state-court warrant and filing two separate actions in State court seeking injunctions to compel compliance with HB 1470. There is also no dispute that "the law is aimed directly at" GEO, which has a contract with the federal government to provide secure residential support services at the sole facility to which HB 1470 applies, thanks to statutory carve-outs for every other state and private facility. *See* Part II *infra*. That the State now tells this Court that HB 1470 has no current impact on GEO is not only inaccurate, but constitutes a material and knowing misrepresentation of fact to the Court.

The district court correctly noted one example of GEO's "realistic danger of sustaining a direct injury," *Flower World*, 43 F.4th at 1229, from HB 1470: the requirement of "heating and air conditioning equipment that can be adjusted by room or area." 1-ER-72; Wash. Rev. Code § 70.395.040(1)(g). Bringing the NWIPC into compliance with this requirement will cost approximately $3 million. 6-ER-1290. The State responds in its Opening Brief that it might construe "area" in a way that matches the NWIPC's current infrastructure. OB 18. On its own terms, that hypothetical relief is dubious because the word "area" appears with "room," indicating that the large portions of the NWIPC governed by a given set of HVAC controls is impermissible. *See Yates v. United States*, 574 U.S. 528 (2015) (explaining *noscituur a sociis* cannon). Moreover, even if the State's interpretation, expressed through rulemaking, saved the NWIPC, that construction would not control in litigation brought by detainees. Under the provision creating a private right of action, detainees could sue GEO urging a more restrictive construction of "room or area." Wash. Rev. Code § 70.395.070(1). Finally, at most, what the State attempts to characterize as unripeness is actually potential mootness. If the Washington Department of Health someday

21

promulgates the lax rules it dangles before this Court, it might moot GEO's complaint as to the HVAC provision.

In addition to the HVAC provision, GEO is alleged to be currently violating other aspects of the comprehensive rules in HB 1470. Section 2(1)(d), for example, requires federal contractors to provide detainees with a specific list of toiletries "regularly at no cost." Instead, GEO provides an initial supply of six enumerated items mandated in the PBNDS, as incorporated into GEO's contract with the federal government. 6-ER-1140 (citing PBNDS 2011 § 4.5); *see also* 4-ER-670–84. By definition, providing additional toiletries would impose a cost on GEO and, in turn, on the federal government, that federal regulations do not impose.

Similarly, Section 2(1)(e) requires that GEO provide detainees "fresh fruits and vegetables," a term defined as "not including any process, canned, frozen, or dehydrated fruits or vegetables." Wash. Rev. Code §§ 70.395.020(5), 70.395.040(1)(e). The PBNDS again differs from this requirement, expressly allowing "canned fruit." 5-ER-1064–1072 (citing PBNDS 2011 § 4.1). Switching to fresh fruits and vegetables will impose an additional cost that the federal government's contract

22

standards do not impose. *See McCreary Cnty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 863 (2005) (explaining the Court's reliance on "common sense" in reviewing preliminary injunctions).

The many ways in which GEO's compliance with federal directives leaves it exposed under HB 1470 lead to "a genuine threat of enforcement." *Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009) (quotation omitted). On four separate occasions, agents for the State have arrived at the NWIPC demanding unlimited access to the facility to enforce the provisions of HB 1470. 1-ER-63. On the most glaring of those occasions, Labor & Industries went to state court and obtained an *ex parte* warrant purportedly granting its inspectors access to the NWIPC—based on the authority in HB 1470. Those provisions require routine, unannounced inspections of the NWIPC. Wash. Rev. Code § 70.395.050(1)(a). Moreover, they do not distinguish between areas that ICE deems secure and those that are otherwise available to visitors to the facility.

The purpose of the inspections is, unsurprisingly, to enforce the other provisions of HB 1470. Wash. Rev. Code §§ 70.395.050(5), 70.395.070. When state officials charged with enforcing a law invoke that

23

very law to take the first step in enforcement, there can be no doubt that a constitutional challenge is ripe. *See Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 60–61 (9th Cir. 2024) (finding Attorney General letter announcing investigation under a state anti-discrimination law sufficient to establish pre-enforcement standing). The State's pending lawsuits to enforce HB 1470 only underscore the fact that HB 1470's impact on GEO is not "wholly contingent upon the occurrence of unforeseeable events." *Thomas*, 220 F.3d at 1141. In that regard, GEO's suit is no longer a pre-enforcement challenge—the State has thrown down its enforcement gauntlet, and GEO is challenging all further attempts to enforce HB 1470 against the only facility in the state subject to its reach.

Finally, the existence of a private right of action creates another basis for ripeness, apart from the State's efforts to enforce HB 1470. If this Court were to vacate the injunction, detainees could bring suits to enforce the provisions of HB 1470, collecting damages of $1,000 per violation, or actual damages, whichever is greater. Wash. Rev. Code § 70.395.070. As noted above, GEO cannot comply with various provisions of HB 1470 and conflicting terms of its federal contract. Even if the State itself withheld enforcement until its rulemaking was

24

complete (which it is not), the risk of private enforcement remains imminent.

The State's desire to avoid adjudication is understandable, but arguing ripeness in this case while suing GEO to enforce HB 1470 in two separate pending actions is the height of dishonesty. The Washington Legislature did not pass HB 1470, with its detailed conditions and private enforcement mechanism, for the sake of delayed results. It did so to circumvent *Newsom* immediately. The plain language of the statue confirms that this controversy is ripe.

## II. HB 1470 Violates Federal Supremacy Through the Intergovernmental Immunity Doctrine.

The first, and in this case, the controlling factor in whether a preliminary injunction should issue is the moving party's likelihood of success on the merits. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). The district court correctly concluded that GEO was likely to succeed on the merits of its claim for injunctive relief based on the intergovernmental immunity doctrine. The lower court focused on the version of that doctrine that prevents States from discriminatorily imposing burdens on the federal government or its contractors greater than those imposed on the State or its contractors. This Court can affirm

25

on that basis or on the related aspect of intergovernmental immunity that forbids States from directly regulating the federal government and its contractors. Under either approach, GEO is very likely to succeed on the merits.

### A. HB 1470 Expressly Favors State Agencies and Contractors over Federal Contractors.

While subjecting the federal government and its contractors to additional regulations, inspection obligations, and private lawsuits by detainees, HB 1470 expressly exempts state entities from the same: "The state and its agencies are not liable for a violation of this chapter." Wash. Rev. Code § 70.395.070. It is thus more than "happenstance," OB 32, that HB 1470 applies **only** to the NWIPC. The Washington Legislature's entire purpose in adopting HB 1470 was to circumvent this Court's decision in *Newsom*.

### 1. HB 1407 Targets Federal Contractors

The intergovernmental immunity doctrine "prohibit[s] state laws that *either* 'regulat[e] the United States directly or discriminat[e] against the Federal Government or those with whom it deals' (e.g., contractors)." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (emphasis original; quoting *North Dakota*, 495 U.S. at 435). Just two years ago, the

26

Supreme Court recognized that a different Washington statute violated the anti-discrimination aspect of intergovernmental immunity. It noted that the law "applie[d] only to a 'person, including a contractor or subcontractor, who was engaged in the performance of work, either directly or indirectly, for the United States.'" *Id.* (quoting Wash. Rev. Code § 51.32.187(1)(b)). What that statute did directly, HB 1470 accomplishes by negative implication through its exemption of state agencies.

The State's reliance on the "letter of the law" is misplaced. *E.g.,* OB 15. For starters, the "letter of the law" includes the express exemptions for state agencies in Sections 70.395.070 and 70.395.080, as well as a list of private detention facilities exempted in Section 70.395.100. These exclusions are just as much the "letter of the law" as the seemingly neutral language on which the Opening Brief relies. But the presence of neutral language that would seem to encompass state actors as well as federal ones does not erase the exemptions that leave only the NWIPC within HB 1470's scope. Washington could not regulate the U.S. Navy, for example, by adopting a broad regulation for all vessels over 50 feet long and then exempting state ferries, commercial fishing vessels,

27

pleasure boats, research vessels, etc.  Exemptions are as much a part of the law as its affirmative regulatory provisions.  Refusing to consider them would elevate form over substance and nullify intergovernmental immunity.  *Washington v. United States*, 460 U.S. 536, 544 (1983).

The Washington Legislature and Defendant Attorney General have both confirmed that HB 1470 singles out federal contractors for additional burdens.  The bill's primary sponsor in the House noted that it would apply only to the NWIPC.  *See* Washington State Senate Human Services Committee hearing on 2SHB 1470 - Concerning private detention facilities (Mar. 13, 2023 10:30 a.m. at 16:20), *available at* https://tvw.org/video/senate-human-services-2023031331/?eventID=2023031331.  The same testimony came up in the Senate.  *See* Washington State Senate Ways & Means Committee hearing on 2SHB 1470 - Concerning private detention facilities (Mar. 30, 2023 12:30 p.m. at 4:07:34), available at https://tvw.org/video/senate-ways-means-2023031607/?eventID=2023031607 ("only one facility would be affected").

If any doubt remained, the Attorney General explained in the Washington Multiple Agency Fiscal Note Summary that the list of excluded facilities in Section 10 would assure that state contractors

28

remained unaffected: "[w]hile prior versions of the bill could have impacted private detention facilities that DSHS might wish to contract with in the future, the new language in Section 10 of this bill exempts those types of facilities from the new requirements." Wash. Multiple Agency Fiscal Note Summary, https://fnspublic.ofm.wa.gov/ FNSPublicSearch/GetPDF?packageID=68477 at 15 (last accessed Jul. 18, 2024). The exemptions in Section 10 would reduce the number of covered facilities "from three to now just one at the Northwest Detention Center in Tacoma," apparently because even two state contractors were too many. *Id.* at 24.

In response, the State relies almost exclusively on *Dawson v. Steager*, 586 U.S. 171 (2019) and *United States v. Nye Cnty., Nev.*, 178 F.3d 1080 (9th Cir. 1999). OB 25–26. That reliance is misplaced. In *Dawson v. Steager*, 586 U.S. 171 (2019), the Court considered whether a West Virginia statute that exempted from state taxation the pension benefits of certain state and local law enforcement officers but not the federal pension benefits of retired federal marshals violated 4 U.S.C. § 111. *Id.* at 173–74. West Virginia argued that the statute was not intended to harm federal retirees, but instead to help certain state

29

retirees.  *Id.* at 175.  The *Dawson* Court held that, under 4 U.S.C. § 111, a laudable intent would not save a discriminatory tax statute:

> We can safely assume that discriminatory laws like West Virginia's are almost always enacted with the purpose of benefiting state employees rather than harming their federal counterparts. Yet that wasn't enough to save the state statutes in *Davis*, *Barker*, or *Phillips*, and it can't be enough here. Under § 111 what matters isn't the intent lurking behind the law but whether the letter of the law "treat[s] those who deal with" the federal government "as well as it treats those with whom [the State] deals itself."

*Id.* at 177 (emphasis added; citations omitted). *Dawson* does not, as the State suggests, stand for the inverse proposition that this court should ignore a legislative history replete with discriminatory intentions when evaluating whether a statute violates the Intergovernmental Immunity Doctrine.  *See United States v. Hynes,* 759 F. Supp. 1303, 1306–07 (N.D. Ill. Mar. 26, 1991) ("look[ing] solely at the apparent neutrality on the face of the amendment would be to elevate form over substance, which must be avoided" and noting legislative history reveals discriminatory intent).

*Nye* is equally unhelpful to the State.  That case merely noted that "the wording of a tax measure is significant" when trying to distinguish between taxing property and taxing the beneficial **use** of property.  178 F.3d at 1084 ("when a statute says it taxes property it probably does. And

30

when it says it doesn't, it probably doesn't" (quotation omitted)).  The holding in *Nye* has no application in the current circumstances.

The Defendants' reliance on *Nye* does, however, point to a repeated error in their Opening Brief: reliance on tax cases.  Chief among those is *Washington v. United States*, 460 U.S. 536 (1983).  OB 27–31.  On its own terms, *Washington* does not bless discrimination against federal contractors.  Just the opposite.  It approved a tax reform that imposed state sales tax on all contractors' purchases but, to comply with intergovernmental immunity, did not tax the labor costs and markup that federal contractors' charged the federal government.  *Id.* at 539–40.  As a formal matter, the State did not tax any part of the invoice to the federal government, but presumably the sales tax on materials was passed through.   In any event, the result was that "the Federal Government and federal contractors are both ***better off*** than other taxpayers . . . ."  *Id.* at 541 (emphasis added).  That is "hardly . . . the mistreatment of the Federal Government against which the Supremacy Clause protects."  *Id.* at 542.

More generally, tax cases present a different paradigm.  This Court and the Supreme Court "distinguish regulations that merely increase the

31

federal government's costs from those that would control its operations." *Newsom*, 50 F.4th at 755. Tax laws generally belong to the former category. Thus, the Supreme Court has limited Supremacy Clause challenges involving state tax laws to those "when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *United States v. New Mexico*, 455 U.S. 720, 735 (1982). Where state taxes on federal contractors do not substantially interfere with the federal government's operations, courts permit them to stand. *Boeing*, 768 F.3d at 839. But that level of tolerance does not apply to state substantive laws that attempt to establish alternative standards governing the performance of federal contractors' conduct rather than their tax obligations.

In the same vein, the State of California defended its inspection statute in *California v. United States* as one that "does not impose standards on the conditions of facilities, nor does it mandate any policies and procedures." Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, *United States v. California*, No. 2:18-cv-00490-JAM-KJN, 2018 WL 3350892, at 29–30 (E.D. Cal. May 4, 2018). That

32

distinction prefigured the distinction this Court drew in *Newsom* between tax laws that "merely increase the government's cost" by taxing government contractors alongside everyone else and "those that would control its operations." 50 F.4th at 755 (*en banc*). The Opening Brief's dependence on *California* and tax cases makes little sense in light of the fact that HB 1470 applies only to the NWIPC and expressly seeks to "control its operations." The federal government's operations at NWIPC will be different—not merely more expensive—if HB 1470 takes effect. *California* and the tax cases are therefore inapposite, as *Newsom*, *Boeing*, and *New Mexico* recognize.

### 2. HB 1470 Imposes More Burdensome Requirements than Those Applicable to State Facilities.

The exemption for state facilities necessarily establishes that a statute imposing far-reaching requirements and threating statutory damages for federal facilities imposes a greater burden on the federal government than on the State. If any doubt remains, the district court correctly compared the substantive provisions of HB 1470 with those applicable to state prisons and jails. Its conclusion that the burdens on

federal facilities exceed those of state facilities was not an abuse of discretion. This Court should affirm.

Defendants' primary attack on the district court's reasoning is a legal sleight of hand. They maintain that, because the State generally prohibits use of detention contractors, it cannot possibly treat federal contractors worse. OB 30–32. That argument misses the relationship between contractors and the governments they serve. Intergovernmental immunity prohibits States from burdening the federal government, but "[t]he federal government's decision to hire [a contractor] does not affect the legal analysis." *Boeing*, 768 F.3d at 839 (citing *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988)). Similarly, the State's decision ***not*** to hire a contractor does not affect the analysis. The relevant comparison remains between the federal government or its contractors on one side and the State or its contractors on the other. If the State does not use contractors, then the relevant comparator is the most analogous state agency. Put simply, it is the ***government***, state or federal, that is the proper focus of intergovernmental immunity inquiries, not the contractors who may or not be engaged by either governmental entity to perform in accordance with their respective governmental contracts.

34

Defendants' argument also creates a comical loophole. It would allow the States to eschew contractors and then cripple the federal government's operations by saddling its contractors with any conceivable regulation. For example, if a State banned its own use of private contractors to provide security at state courthouses and office buildings, it would be able to impose *any* restrictions on federal security contractors in the name of public safety. After all, "federal contractors [would be] better off than state contractors, who are largely prohibited in operating." OB 31. Defendants cannot dodge the legal framework and eviscerate the Supremacy Clause by simply electing not to use contractors for state facilities.

Here, the district court did not need to search long to find the most analogous state agency for its intergovernmental immunity analysis. In fact, this Court already answered the question in *California*, when it recognized that "state and local detention facilities" are the comparators for federal detention facilities. 921 F.3d at 885. Congress also answered the question. It expressly recognized the interchangeability of a federal immigration detention facility with a list of substitutes that the Secretary should consider leasing before constructing a new facility,

35

including a "prison, jail, detention center, or other comparable facility."
8 U.S.C. § 1231(g)(2).

The district court reiterated the logic behind comparing federal
detention facilities to local prisons and jails for intergovernmental
immunity purposes. 1-ER-6–7, 45–48. Both categories serve the purpose
of detention, which includes both preventing escape and limiting the
materials and communications that may reach persons detained. They
also house a population that is 100% involuntarily detained (unless, in
GEO's case, a detainee were to assent to deportation, but that option does
not involve rejoining the community).

Furthermore, Defendants' alternative comparators contradict the
statute itself. Their leading candidate is "residential treatment
facilities," OB 37–41, but HB 1407 expressly ***excludes*** those facilities,
Wash. Rev. Code § 70.395.100(2); *see also id.* § 70.395.100(6) (excluding
drug treatment facilities). "Treatment" facilities also serve an entirely
different function; the federal government is not "treating" immigration
detainees, but merely housing them while their immigration status is
reviewed and processed. They do not, unlike the State's residential
treatment facilities, provide "twenty-four hour on-site care . . . for the

36

evaluation, stabilization, or treatment of residents for substance use, mental health, co-occurring disorders, or for drug exposed infants." Wash. Rev. Code § 71.12.455(7). The same is true for civil commitment under Washington's "Involuntary Treatment Act, RCW 71.05," which the Opening Brief treats as its own category, OB 41–44, even though the same exclusion in HB 1470 applies, Wash. Rev. Code § 70.395.100(2) (listing chapter 71.05). That makes sense, because, as its name suggests, the Involuntary Treatment Act serves the same purposes as other treatment facilities. And, again, those purposes differ from immigration detention.

Defendants next attempt to obscure the burdens imposed under HB 1470 by presenting tables purportedly identifying laws that impose the same or greater burdens on state facilities. The problems with this argument are legion. First, it never addresses the standard of review. Whether two legal burdens are equivalent is reviewed for abuse of discretion. *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 382 (9th Cir. 2016) (reviewing district court's holding regarding relative burden on white and non-white voters for abuse of discretion); *Int'l Franchise Ass'n v. Seattle*, 803 F.3d 389, 399, 406–07 (9th Cir. 2015) (reviewing

37

district court determination of relative burden on in-state and out-of-state commerce for abuse of discretion). Second, the bare fact that Washington regulates the **same general subjects** in state facilities does not show that the regulations are comparable. Third, Defendants are simply mistaken in most of their comparisons. Here, for example, are a small sample of provisions that not only disadvantage federal facilities but also go beyond the policy choices that the federal government has made (*see* Part III *infra*):

| HB 1470 Requirements: Section 2(1)(d) | Standards Applicable to Comparable Washington Jail & Prisons | Federal Requirements |
|---|---|---|
| Basic personal hygiene items must be provided to a detained person ***regularly at no cost***. Sec.2(1)(d)<br><br>"Basic personal hygiene items" includes soap, toothbrush and toothpaste, shampoo and conditioner, lotion, nail clippers, comb, towels, and feminine products. Sec.9(1) | "All offenders incarcerated within department of corrections facilities shall be responsible for the acquisition and replenishment of personal hygiene items after the ***initial issuance*** of those items at the reception center." Wash. Admin. Code (WAC") 137-55-030(1) (emphasis added) | "Each detainee shall receive, at a minimum, the following items:<br>1. one bar of bath soap, or equivalent;<br>2. one comb;<br>3. one tube of toothpaste;<br>4. one toothbrush;<br>5. one bottle of shampoo, or equivalent; and<br>6. one container of skin lotion. |
| | Defendants' Claimed Comparators | *** |
| | Residential | Female detainees shall be issued and |

| | Treatment Facility (OB 38) Must provide "toilet tissue." WAC 246-337-124<br><br>Private Psychiatric and Alcoholism Hospitals (OB 42) None. | may retain sufficient feminine hygiene items . . . unbreakable brushes with soft, synthetic bristles to replace combs." PBNDS 2011, Sec. 4.5 |

| HB 1470 Requirements: Section 2(1)(e) | Standards Applicable to Comparable Washington Jail & Prisons | Federal Requirements |
|---|---|---|
| A private detention facility shall provide a nutritious and balanced diet, including **fresh fruits and vegetables**, and shall recognize a detained person's need for a special diet. Sec.2(1)(e)<br><br>"Fresh fruits and vegetables" means any unprocessed fruits or vegetables, **not including any processed, canned, frozen, or dehydrated fruits or vegetables**." | No requirement of any fruits or vegetables.<br>Defendants' Claimed Comparators<br>Private Psychiatric and Alcoholism Hospitals  (OB 43) Must provide "well balanced meals," "nourishing snacks" and foods "that contribute to nutritional requirements." WAC 246-322-230 | PBNDS Section 4.1 specifically allows "canned fruit." PBNDS 2011, Sec. 4.1 |

39

| Sec.9(5) | | |
| --- | --- | --- |
| | | |

| HB 1470 Requirements: Section 2(1)(g) | Standards Applicable to Comparable Washington Jail & Prisons | Federal Requirements |
| --- | --- | --- |
| The private detention facility must have both heating and air conditioning equipment that can be adjusted by room or area. Rooms used by a detained person must be able to maintain interior temperatures between 65 degrees Fahrenheit and 78 degrees Fahrenheit year-round. Excessive odors and moisture must be prevented in the building. Sec. 2(1)(g) | No similar requirements. **Defendants' Claimed Comparators** "Administrative Segregation and Intensive Management" (*i.e.*, Solitary Confinement) (OB 45) "comfortable temperature" in solitary confinement. WAC 137-32-030  "Residential Treatment Facilities" (OB 43) "heating system operated and maintained to sustain a comfortable, healthful temperature in all habitable rooms." WAC 246-322-120(4),(5) | No similar requirements. |

| HB 1470 Requirements: Section 2(1)(a) | Standards Applicable to Comparable Washington Jail & Prisons | Federal Requirements |
|---|---|---|
| Requires "environment that allows a detained person to use the person's personal belongings." Sec. 2(1)(a) | "(1) Only authorized items may be retained by an inmate in the custody of the department. *** (2) Authorized items may be limited in quantity and value *** (3) Each superintendent shall establish regulations setting forth specific authorized items and levels of personal property for those inmates confined to that institution." WAC 137-36-030 | Specifically prohibits a long list of items based on safety and security. PBNDS 2011 Sec. 2.5 |
|  | Defendants' Claimed Comparators |  |
|  | None claimed. |  |

| HB 1470 Requirements: Section 2(2) | Standards Applicable to Comparable Washington Jail & Prisons | Federal Requirements |
|---|---|---|
| Office of Attorney General to enforce violations on its own initiative or based on complaints. | No similar requirements. | Comprehensive federal oversight, audit, and enforcement system for facility operations, |
|  | Defendants' Claimed Comparators |  |

41

| | | |
|---|---|---|
| Sec. 2(2)<br><br>Any detained person aggrieved by a violation of this chapter has a right of action in superior court and may recover for each violation as follows:<br>(a) Against any person who negligently violates a provision of this chapter, $1,000, or actual damages, whichever is greater, for each violation;<br>(b) Against any person who intentionally or recklessly violates a provision of this chapter, $10,000, or actual damages, whichever is greater, for each violation;<br>(c) Reasonable attorneys' fees and costs if the detained person is the prevailing party; and<br>(d) Other relief, including an injunction, as the court may deem appropriate.<br>Injunctive relief may | None claimed. | contract requirements, and federal detention standards.<br><br>6 U.S.C.§ 112(b)(2); 28 U.S.C. § 530C(a)(4);  8 U.S.C. § 1231(g)(1); 48 C.F.R. § 1.601(a); 48 C.F.R. § 3017.204-90; 8 C.F.R. § 235.3(e); 6 U.S.C. § 205(a) & (b); PBNDS 2011 |

42

| | | |
|---|---|---|
| be issued without bond in the discretion of the court, notwithstanding any other requirement imposed by statute. Sec. 5(1) | | |

| HB 1470 Requirements: Section 3(1) | Standards Applicable to Comparable Washington Jail & Prisons | Federal Requirements |
|---|---|---|
| Washington Department of Health mandated to conduct ***routine, unannounced*** inspections of private detention facilities. Sec. 3(1)(a)<br><br>And to investigate detainee complaints. Sec. 3(1)(b)<br><br>And to review food service. Sec. 3(1)(c)<br><br>And to test water and air quality every six months. Sec. 3(1)(d)<br><br>And to post results on DOH website. Sec. 3(1)(e) | General inspection authority of Department of Health does ***not*** mandate inspections and only permits inspections to investigate "threat to the public health including, but not limited to, outbreaks of communicable diseases, food poisoning, contaminated water supplies." Wash. Rev. Code § 43.70.170<br><br>**Defendants' Claimed Comparators**<br><br>Prison Safety Standards (OB 45) Department of Corrections—***not*** **DOH**—will conduct | Comprehensive federal oversight, audit, and enforcement system for facility operations, contract requirements, and federal detention standards.<br><br>6 U.S.C.§ 112(b)(2); 28 U.S.C. § 530C(a)(4);  8 U.S.C. § 1231(g)(1); 48 C.F.R. § 1.601(a); 48 C.F.R. § 3017.204-90; 8 C.F.R. § 235.3(e); 6 U.S.C. § 205(a) & (b); PBNDS 2011 |

43

| | | |
|---|---|---|
| The Department of Labor and Industries shall conduct **routine, unannounced** inspections of workplace conditions at private detention facilities, including work undertaken by detained persons. Sec. 3(4) | ***biannual*** safety inspections.<br><br>Nothing regarding complaints, food, air, water, or publication. | |

At best, the State's tables show that HB 1470 regulates the same **general topics** that the State regulates in its own facilities. That, however, is not the standard. Intergovernmental immunity asks whether HB 1470's requirements are "imposed equally on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438. Defendants' efforts to avoid the obvious conclusion that they are not "imposed equally" fail at every turn. State prisons and jails need not comply with the requirements of HB 1470, making it an improper attempt by a State to handicap federal operations within its borders. The Supremacy Clause does not allow that.

44

### B.   HB 1470 Directly Regulates Federal Contractors.

In addition to prohibiting disparate treatment, intergovernmental immunity also prevents States from directly regulating the federal government or its contractors. *Newsom*, 50 F.4th at 760. HB 1470 violates this principle as well. In fact, it does nothing but directly regulate GEO as a federal contractor. This Court can therefore affirm on this alternative basis as well.

The seminal decision on direct regulation is *Boeing v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014). In *Boeing*, the federal government assumed responsibility for cleaning up contamination caused by its prior operations at a contractor's property. It entered a contract with Boeing, which then owned the land, to implement the remediation consistent with standards incorporated into the contract. *Id.* at 836. Dissatisfied with the federal government's plan, the State of California adopted a law that would impose different standards on Boeing. *Id.* at 837. This Court found that law invalid because it "replaces the federal cleanup standards that Boeing has to meet to discharge its contractual obligations to DOE with the standards chosen by the state." *Id.* at 840. Supplanting the

45

contractual terms in this way "regulates the federal government directly in violation of the Supremacy Clause." *Id.* at 842.

*Boeing* disposes of the current case. As in *Boeing*, the federal government has entered into a contract with GEO that incorporates federal standards, namely, the PBNDS, that govern the performance of the contracted services. And, as in *Boeing*, a State has adopted a statute—HB 1470, Sections 2, 3, 4, 5, and 6—that purports to override and supplant the PNBDS with standards the State of Washington believes should govern the federal contractor's performance. That is the end of the case.

The district court dismissed GEO's direct-regulation claim (in a non-final order[1]) based on an apparent misreading of *Boeing*. The court distinguished *Boeing* because "the cleanup standards in *Boeing* were adopted by DOE pursuant to an act of Congress, [but] the PBNDS is *not* congressionally mandated." 1-ER-52. That is simply not correct.

_____

[1] This Court "may affirm [a preliminary injunction] on any legitimate basis supported by the record." *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1076 (9th Cir. 2000). And a party, like GEO here, that prevails in the district court "needn't cross-appeal an adverse interlocutory order to urge the rejected argument as an alternative ground for affirming the final judgment." *Jones v. Bernanke*, 557 F.3d 670, 676 (D.C. Cir. 2009).

46

The cleanup standards in *Boeing* were not "adopted pursuant to an act of Congress" or "congressionally mandated" any more than the ICE contract terms and the PBNDS were. The statute at issue in *Boeing* was the Atomic Energy Act ("AEA") which required the Atomic Energy Commission (later the Department of Energy) to "provide for safe storage, processing, transportation, and disposal of hazardous waste . . . ." 42 U.S.C. § 2121. The AEA does not include cleanup standards, limits, guidance, or other direction to the agency regarding this statutory directive to provide for safe disposal. *Id.* As this Court noted, the "federal cleanup standards" were not contained in the AEA but were ***developed by Boeing*** based upon agency "orders" and "manuals" issued by DOE under the authority granted DOE in the Atomic Energy Act. *Boeing*, 768 F.3d, at 836.

Following the same pattern, various federal statutes charge the Department of Homeland Security ("DHS") with responsibility for detaining non-citizens pending removal. *See* 8 U.S.C. § 1231(g)(1); 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4). Congress also granted the Secretary authority to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities,

47

including related services, on any reasonable basis." 18 U.S.C. § 4013 note "Contracts for Space or Facilities," Pub. L. 106–553, §1(a)(2), 114 Stat. 2762, 2762A-69. Those statutes play the same role in this case that the AEA played in *Boeing*. In implementing them, DHS gave agency heads authority to enter contracts, 48 C.F.R. § 1.601(a), which ICE used to require contractors like GEO to "compl[y] with the Standard Statement of Work for Contract Detention Facilities"—*i.e.,* the current version of the PBNDS. 8 C.F.R. § 235.3(e).

If anything, the PBNDS has a tighter link to congressional authorization than the environmental standards in *Boeing*, because the latter were developed by the contractor, not the federal government, whereas the PBNDS were developed by the federal government. 768 F.3d at 836. Either way, the district court erred in distinguishing *Boeing* on the mistaken assumption that the cleanup standards in that case were mandated by Congress. With that error corrected, *Boeing*'s application to this case is straightforward: both cases began with broad congressional mandates; the responsible agencies then entered contracts to carry out their responsibilities; and state law purported to "replace" the "federal standards that [the contractor] has to meet to discharge its contractual

48

obligations." *Id.* at 840. That is the essence of a State directly regulating the federal government in violation of the Supremacy Clause. *Boeing* compels the injunction in this case.

## III. HB 1470 Is Preempted.

"Congress of course has the power, under the Supremacy Clause, to preempt state law." *Puente Arizona*, 821 F.3d at 1103. In addition to express preemption, which is not at issue in this case, Congress impliedly preempts state laws "in at least two other circumstances:" (1) when federal regulation in a given field is "so pervasive that Congress left no room for the States to supplement it" or the field implicates a "federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;" and (2) where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 587 U.S. at 399 (quotation and modification omitted). The district court mistakenly dismissed GEO's preemption claims in this case in another non-final order. 1-ER-55–58. It did so on an incorrect legal assumption that the regulations at issue lack preemptive force. Again, the district court appears not to have taken proper account of the comprehensive federal statutory scheme

49

governing immigration or the PBNDS as standards authorized by Congress and imposed by ICE. Viewed in context, the federal statutory scheme, implementing regulations, and the PBNDS have ample weight to support GEO's preemption claim. *Id.* As noted above, this Court can affirm the preliminary injunction on any basis presented in the district court. *See* Part II.B *supra.* Both species of federal preemption provide appropriate bases to affirm the preliminary injunction.

### A. HB 1470 Unconstitutionally Encroaches on the Fields of Immigration Enforcement and Detention of Foreign Citizens in the United States.

This Court and the Supreme Court have stressed that the field of immigration enforcement belongs to the federal government. That applies to alien classification, *Plyler*, 457 U.S. at 225; *Toll v. Moreno*, 458 U.S. 1 (1982), registration, *Arizona*, 567 U.S. at 401, and employment, *De Canas v. Bica*, 424 U.S. 351 (1976). Given the magnitude of federal interests the courts have recognized in this area—ranging from public safety to foreign relations—it comes as no surprise that they do not permit States to impose a patchwork of idiosyncratic regulations over the federal framework for immigration. HB 1470 is the latest instance of

State policymakers invading the federal field. This Court should enjoin HB 1470 on this independent basis.

The regulation of immigration and naturalization is specifically enumerated in Article I of the Constitution. U.S. CONST. art. I, § 8, cl. 4. "Drawing upon this power, upon its plenary authority with respect to foreign relations and international commerce, and upon the inherent power of a sovereign to close its borders, Congress has developed a complex scheme governing admission to our Nation and status within our borders." *Plyler*, 457 U.S. at 225. The central statute, the Immigration and Naturalization Act ("INA"), creates a "comprehensive federal statutory scheme for regulation of immigration and naturalization," including "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *De Canas*, 424 U.S. at 353.

For preemption purposes, the effect of this "complex," "comprehensive" federal scheme has been a long line of decisions finding field preemption—based on either "a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will

51

be assumed to preclude enforcement of state laws on the same subject."
*Arizona*, 567 U.S. at 399 (quotation and modification omitted).  The most
recent pronouncement on this issue, *Arizona*, held that where Congress
occupies a field, "even complementary state regulation is impermissible."
*Id.* at 400.

To determine whether the federal "framework" is sufficiently
"pervasive" to trigger a finding of field preemption, courts look to statutes
and implementing regulations.  In the field of immigration detention,
Congress has detailed which non-citizens should be detained pending
deportation.  *See Demore v. Kim*, 538 U.S. 510, 531 (2003) (upholding
constitutionality of mandatory detention pending removal).
Unsurprisingly, Congress has also provided instruction on ***how*** ICE
should discharge its detention responsibilities.  In general, the INA
provides that "[t]he Attorney General shall arrange for appropriate
places of detention for aliens detained pending removal or a decision on
removal."  8 U.S.C. § 1231(g)(1).  Among the "appropriate" detention
facilities are those provided and serviced by contractors, which the law
prioritizes ahead of building government facilities: "Prior to initiating
any project for the construction of any new detention facility for the

52

Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(2). To enter those contracts, Congress provided that the Secretary of Homeland Security "shall have the authority to make contracts, grants, and cooperative agreements, and to enter into agreements with other executive agencies, as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law." 6 U.S.C. § 112(b)(2). Moreover, Congress specifically created the office of the Immigration Detention Ombudsman to, *inter alia*, investigate complaints and conduct investigations of any alleged violations of these "detention standards." 6 U.S.C. § 205(b)(5).

The Secretary in turn has promulgated voluminous rules with which contractors must comply. For example, 8 C.F.R. § 235.3(e) requires that "private entities contracted to perform such service . . . shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities." As such, every statement of work—including every contract GEO has entered with ICE—requires compliance with the comprehensive PBNDS. *See*

53

*Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1235 (W.D. Wash. Apr. 28, 2020) ("GEO is required to maintain conditions at the NWIPC in accordance with the Performance-Based National Detention Standards 2011 ('PBNDS').").  As noted above, the PBNDS spans over 450 pages and provides detailed regulations for everything from food to housekeeping to discipline.  U.S. Immigration & Customs Enforcement, *Performance-Based National Detention Standards 2011* (rev. Dec. 2016), *available at* https://www.ice.gov/doclib/detention-standards/2011/pbnds 2011r2016.pdf.  A brief tour through the PBNDS leaves no doubt that it represents "a framework of regulation so pervasive" that it occupies the field.

It is of no moment that Congress has delegated certain functions, including the selection of "appropriate" facilities, to the Secretary of Homeland Security.  8 U.S.C. § 1231(g)(2).  "We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985); *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 243 (3d Cir. 2008) ("Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations

54

issued pursuant to that authority have no less preemptive effect than federal statutes . . . .").  Indeed, this Court has even found preemption of state driver's license laws based on a two-page memorandum issued in the absence of any congressional authorization akin to 8 U.S.C. § 1231(g)(2).  *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *see also id.* at 979 (Berzon, J., concurring) ("the 'law' that has preemptive power over Arizona's policy is Congress' conferral of exclusive authority on the executive branch to defer removal").

The district court rejected GEO's preemption argument in two sentences that misapprehend this very point—it stated that "the PBNDS is merely an agency publication and does not indicate the intent of Congress."  1-ER-56.  This analysis divorces the PBNDS from the Constitution and statutes, chiefly 8 U.S.C. § 1231(g), that demonstrate congressional intent and the ICE regulations that implement the congressional mandate to prioritize private detention facilities and, to that end, require compliance with the PBNDS as part of identifying "appropriate" facilities.  8 U.S.C. § 1231(g); *see also* 18 U.S.C. § 4013 note "Contracts for Space or Facilities" ("Notwithstanding any other provision of law . . . the [Secretary] hereafter may enter into contracts and other

55

agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."). Perhaps if the PBNDS existed independently of these other laws, it would lack preemptive force. But ICE did not promulgate the PBNDS at random; it did so pursuant to congressional mandate.

Congressional regulation in the field of alien detention is extensive and includes express delegation for ICE to promulgate rules related to the conditions of confinement. Just as statutes giving the executive branch broad discretion in identifying which non-citizens to remove was sufficient to imbue the DACA memorandum with preemptive effect in *Arizona Dream Act Coalition*, the express instruction to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal" supplies the necessary congressional intent for giving preemptive force to the regulations through which the executive establishes which facilities are "appropriate." 8 U.S.C. § 1231(g)(1). The district court's isolated consideration of the PBNDS as if it had arisen spontaneously simply mischaracterizes and misapplies the law of field preemption.

56

The district court never addressed the other species of field preemption: "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Arizona*, 567 U.S. at 399. This version of field preemption also has roots in the arena of immigration. *Hines*, 312 U.S. at 52.

As explained in *Hines*, the detention of aliens implicates both the federal government's interest in a "uniform" immigration system and in the conduct of foreign relations. *Id.* at 64–66; *Arizona*, 567 U.S. at 395 (noting that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States"); *see generally* U.S. CONST. art. I, § 8, cl. 3–4, 10–13. Concern for orderly immigration and for the reciprocal treatment of United States citizens detained abroad "make the treatment of aliens, ***in whatever state they may be located***, a matter of national moment." *Id.* at 73 (emphasis added). Thus, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Matthews v. Diaz*, 426 U.S. 67, 81 n.17

57

(1976). The conditions of confinement are therefore the quintessential "field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230.

Under either form of field preemption, the conclusion is the same: "No state can **add to or take from** the force and effect" of federal law governing the detention of aliens. *Hines*, 312 U.S. at 63 (emphasis added). The State of Washington's effort to impose its own requirements for "detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), runs directly into a field that the federal government alone regulates. HB 1470 is therefore preempted.

### B. HB 1470 Is an Unconstitutional Obstacle to Accomplishing Federal Objectives.

GEO is also likely to succeed on its argument that HB 1470 presents an unconstitutional obstacle to the accomplishment of the federal government's carefully crafted standards for the conditions of alien detention. The Supreme Court has repeatedly rejected States' efforts to alter the policy balance the federal government has chosen. Complying with 50 different regulatory structures at added cost is an obstacle to operating a national immigration detention system.

State laws are preempted where "compliance with both federal and state regulations is a physical impossibility" or where "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399 (quoting *Hines*, 312 U.S. at 67). Importantly, States cannot avoid obstacle preemption where they impose stricter standards that would necessarily require compliance with federal law. That was the posture in *Arizona*, in which the State argued against preemption because its criminalization of the failure to carry immigration documents had "the same aim as federal law and adopt[ed] its substantive standards." 567 U.S. at 402. The Court rejected that argument because "[p]ermitting the State to impose its own penalties" would enable the State to bring charges "for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001)).

The situation here is even more invasive. Unlike *Arizona*, the State of Washington does not attempt merely to enforce existing federal requirements; it seeks to impose additional obligations above and beyond

59

those required by ICE.  It could therefore "impose its own penalties" ***not only*** "for violations of federal law" that the federal government elects not to prosecute, but also for violations of additional state requirements.

This conflict is not merely hypothetical.  The State has already attempted to enforce its self-conferred right under HB 1470 to inspect every corner of the NWIPC on four occasions.  Each time, ICE either directed GEO to deny access or denied access on its own.  *E.g.*, 1-ER-63 (citing the State's declaration that "Ryan Jennings, ICE Supervisory Detention and Deportation Officer, refused us entry" and referred state inspectors to "the ICE Field Office Director to schedule a formal tour of the facility").  And it typifies the conflict that HB 1470 creates: state authorities say one thing, and the federal government says the opposite. The entire purpose of the Supremacy Clause is to resolve these disputes in favor of the federal government.

The same is true for detainee grievances.  Congress adopted 6 U.S.C. § 205, creating the Office of the Immigration Detention Ombudsman to hear complaints against federal detention contractors. HB 1470 bypasses that process and creates a state-law cause of action for

60

detainees with a minimum award of $1,000 per violation.  Wash. Rev. Code § 70.395.070(1)(a).

The district court rejected GEO's arguments by repeating again its conclusion that "the PBNDS is not a federal law."  1-ER-58.  In addition to this error in reasoning, *see* Part III.A *supra*, the fact that Congress did not enact the PBNDS is even less material in the context of obstacle preemption.  The Supreme Court has given preemptive effect to policies far less formal than the PBNDS.  In *Am. Ins. Assn. v. Garamendi*, 539 U.S. 396 (2003), the executive branch had entered a number of non-treaty "agreements" with foreign nations and other entities to create a process for recovering the proceeds of insurance policies stolen from Jewish families during the Holocaust.  Unsatisfied with the pace of recovery and the amount of information disclosed by insurance companies, the State of California adopted its own law.  *Id.* at 408–09.  It attempted to justify its action in as a mill-run exercise of state "consumer protection" regulation that only aids the federal objectives, as expressed in informal agreements.  *Id.* at 425.  The Supreme Court disagreed, explaining first that the agreements "are fit to preempt state law, just as treaties are," *id.* at 416, and that California's more stringent statue was preempted

61

because it "employs 'a different, state system of economic pressure,' and in doing so undercuts the President's diplomatic discretion and the choice he has made exercising it," *id.* at 423–24 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)).

Like California in *Garamendi* and Arizona in its eponymous case, the State of Washington characterizes HB 1470 as an unremarkable police-power statute that merely goes above and beyond what the federal government requires.  OB 10, 12.  That argument misses the point of obstacle preemption.  As in *Garamendi* and *Arizona*, it does not matter that compliance with HB 1470 necessarily results in compliance with federal regulations or that the state and federal measures serve a common objective of minimum living standards.  Where the Constitution gives the federal government authority to set a national policy, a state law that raises, lowers, or supplements the federal bar "undercuts" federal officials' choices in how to exercise their authority.

Since the Founding, the Supremacy Clause has invalidated state laws that "interfere with, or are contrary to," federal law.  *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) (Marshall, C. J.).  For almost as long, States have tried to regulate immigration and the treatment of immigrants in

62

the United States.  The Supreme Court has rejected those efforts time and again, because the Constitution entrusts Congress and the President with adopting a national policy of immigration and foreign relations. Washington's HB 1470 is just the latest attempt by a State to alter federal officials' policy choices.  Like all other attempts to encroach on a federal field or create obstacles to the accomplishment of federal objectives, HB 1470 must fail.  This Court should affirm the preliminary injunction on the alternative ground that GEO is likely to succeed in its preemption challenge.

## IV. The District Court Did Not Abuse Its Discretion in Finding that the Remaining Factors Support a Preliminary Injunction.

In addition to GEO's likely success on the merits, the remaining factors support the preliminary injunction—certainly under the abuse-of-discretion standard.  Those factors ask whether GEO "is likely to suffer irreparable harm in the absence of preliminary relief," whether the equities tip in GEO's favor, and whether an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  Alternatively, in this Circuit, an injunction is appropriate even if likelihood of success on the merits in not clear but "there are serious questions going to the merits" and "the

balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Where a State enforces an unconstitutional statute, irreparable harm is straightforward because "constitutional violations cannot be adequately remedied through damages." *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008). That rule applies with full force to state laws that offend the Supremacy Clause: "an alleged constitutional infringement will often alone constitute irreparable harm." *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part and rev'd in part*, 567 U.S. 387 (2012). And it is equally true where the plaintiff is a private party asserting preemption arguments. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). The current lawsuit fits that mold and justifies the same outcome.

The public interest also weighs heavily in favor of enjoining HB 1470. In *Winter*, the Supreme Court reversed the issuance of a preliminary injunction because the lower courts did not give due weight to the public interest in "realistic" military training exercises, relative to the potentially harmful effects of those exercises on marine mammals. 555 U.S. at 25–26. While a uniform federal immigration policy may be

64

less vital to the nation than a well-trained military, it nevertheless appears in the same list of enumerated powers in Article I, § 8. And the State of Washington's stated interest in forcing its way into federal detention facilities, imposing its own substantive operating requirements, and creating a private cause of action is negligible in comparison to our nation's interests in a uniform federal immigration policy. The public interest favors a uniform functioning immigration detention system, which cannot exist with every State imposing its own requirements and liabilities for federal facilities operating within its borders. This situation typifies the general rule that "the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012).

Finally, the equities favor enjoining HB 1470. As in the context of the public interest, it "would not be equitable" to permit Defendants "to violate the requirements of federal law." *Brewer*, 855 F.3d at 978. In addition to that general principle, the record demonstrates the specific inequity of allowing the State to enforce HB 1470 in conflict with federal law. When state agents arrived unannounced at the NWIPC demanding

65

unfettered access to the facility pursuant to HB 1470, ICE turned those agents away. 1-ER-63. If HB 1470 were permitted to take effect, GEO would have been forced to violate either the state law or the directives of the federal officials to whom it answers. Forcing a law-abiding business into that position is the height of inequity.

On the other side of the scale, Defendants and Amici resort to a based and emotionally charged survey of articles, reports, and various allegations finding fault with every privately contracted prison or detention facility. But the litany of alleged violations of humane standards of care for federal detainees ignores the extensive federal regulation and oversight of the NWIPC, a small portion of which is detailed in the table above. However well-intentioned HB 1470 might be in the eyes of its partisan authors, the Supremacy Clause requires that the Washington Legislature yield to the comprehensive statutory framework enacted by Congress for the detention of aliens pending removal from the United States and the congressionally mandated standards that govern every aspect of operations at the NWIPC.

## CONCLUSION

The federal government is supreme in the field of immigration. It determines who enters the United States and on what terms. It also specifies the consequences for violating immigration laws, including when to detain non-citizens and the conditions of that detention. In exercising that authority, Congress has expressly provided that ICE is to use private detention facilities before building new government facilities. The State of Washington is free to adopt a different policy for its own state and local detention facilities, but the Supremacy Clause forecloses its efforts to ban or regulate federal detention operations in Washington State. Based on the various applicable principles of intergovernmental immunity and preemption arising from the Supremacy Clause of the U.S. Constitution, this Court should affirm the injunction against enforcement of HB 1470, which seeks to impose different and idiosyncratic rules for federal immigration detention facilities located in the State of Washington.

July 18, 2024                         Respectfully submitted,

                                      */s/ Dominic E. Draye*

Scott Schipma                         Dominic E. Draye
The GEO Group, Inc.                   Christopher M. O'Brien
4955 Technology Way                   GREENBERG TRAURIG, LLP

67

Boca Raton, FL  33431                2101 L Street NW
(561) 999-7615                       Washington, DC 20037
scott.schipma@geogroup.com           (202) 331-3100
                                     drayed@gtlaw.com


*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of 9th Cir. R. 32-1(a) because this brief contains 12,683 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century type.

<u>/s/ Dominic E. Draye</u>
Dominic E. Draye

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 18, 2024. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


/s/ Dominic E. Draye
Dominic E. Draye